MISSOURI-KANSAS PIPE LINE COMPANY, a corporation duly organized and existing under the laws of the State of Delaware, *v.* REUBEN SATTERTHWAITE, JR., Garnishee of Dupuy G. Warrick.

(*April* 18, 1940.)

RODNEY and SPEAKMAN, J. J., sitting.

*James R. Morford* (of Marvel and Morford) for plaintiff.

*Caleb S. Layton* (of Richards, Layton and Finger) for garnishee.

Superior Court for New Castle County, No. 72, November Term, 1938.

SPEAKMAN, J., delivering the opinion of the Court:

The chief question in controversy is whether the garnishment proceedings resulted in the attachment of any goods, chattels, rights, credits, money or effects of Mr. Warrick, in the hands of the garnishee.

The garnishee contends that at common law commercial paper could not be seized and sold upon execution, and that the checks, even if they had been accepted by Mr. Satterthwaite, would not constitute the kind of property which was subject to attachment in the hands of the garnishee.

In reply the plaintiff says (1) the proposition that at common law commercial paper could not be seized and sold upon execution is not in issue in the garnishment proceedings, although it may become an issue in a subsequent phase of the main case involving the attachment of the

checks, and (2) the proposition has no application to a certified check, as here involved.

We must consider these questions in their order:

(1) We agree that the liability of commercial paper to seizure and sale by execution is not in issue in the garnishment proceedings, if we merely consider the checks as tangible personal property. Such questions would concern the original attachment rather than garnishment proceedings. Because, however, it is claimed that the checks were at some time in the possession of Mr. Satterthwaite, although afterwards taken into possession by the Deputy Sheriff, it does become material to briefly consider these circumstances.

The statute (*Section 4612 of the Revised Code of 1935*) provides:

"The sheriff, or other officer, shall, under such writ [of attachment], attach all the defendant's property real and personal, and his rights and credits that can be found; and shall take possession of the said personal property, rights and credits, and have them inventoried and appraised, and shall be answerable therefor; but if he cannot have actual possession thereof, he shall notify the person in whose hands, or possession, they are supposed to be, that he attaches the same at the plaintiff's suit, for the use of all the defendant's creditors, and that he doth summon him, as a garnishee, to appear and answer as commanded by the writ;  *  *  *."

It conclusively appears from the evidence that neither at the time the writ was actually served nor at any time thereafter were the checks in the actual possession of Mr. Satterthwaite. At and immediately before the service of the writ of attachment on him, they were on the desk at which he was sitting. He repeatedly said, in the presence of the Deputy Sheriff, "I didn't accept the checks." At and immediately prior to the service of the writ there was nothing to prevent the Deputy Sheriff from having the actual possession of the checks. This was plainly evident from Mr. Satterthwaite's actions and words. In fact, within a few minutes after the service of the writ, the Deputy

Sheriff, at the direction of Mr. Logan, took actual possession. This taking is further evidenced by the Sheriff's return to the writ, which had the approval of Mr. Logan, and the fact that the checks were at the time of the trial in the Sheriff's custody and control. By reason of these circumstances the Sheriff had no authority under the statute to notify Mr. Satterthwaite that he attached the checks in his hands at the plaintiff's suit.

We thus see that the validity of the garnishment of the checks or of the credits secured thereby, when accompanied by the actual seizure and possession of the checks by the Sheriff, must directly involve the question as to whether the checks had or had not been accepted by Mr. Satterthwaite.

(2) The question as to whether or not the checks were actually accepted by Mr .Satterthwaite is in sharp dispute. We shall briefly state the evidence concerning the alleged acceptance and then show why, in our opinion, the question does not require that basic consideration to which, at first, it seems entitled.

On April 5, 1938, a decree was entered by the chancellor, denying leave to file a bill of review pertaining to the allowance made to Mr. Warrick, and directing the receivers to pay forthwith unto him the sums allowed by the court. From this decree an appeal was taken to the Supreme Court, and on October 11, 1938, the Supreme Court filed an opinion affirming the decree of the chancellor, and entered an order pursuant thereto. Previous to the entry of the order by the Supreme Court checks had been drawn for said amounts by the receivers, to the order of Mr. Satterthwaite, as attorney for Mr. Warrick. The reason given was that one of the receivers resided in Chicago, that it took some days to obtain his signature, and it was thought advisable to have the checks ready for delivery in the event the chancellor's order was affirmed. Prior to October 11,

1938, the checks had been delivered to Mr. Logan by the receivers.

From Mr. Logan's testimony it appears that on October 11, 1938, he was solicitor for the receivers, and was also attorney for the plaintiff in this case. On that day he was in Dover, and after the entry of the order by the Supreme Court he telephoned his office in Wilmington and instructed his secretary to have the two checks certified. He returned to his office at about two o'clock and found that the checks had been certified; that this suit was instituted at about three o'clock; that he made an appointment for Mr. Satterthwaite to come at about four-fifteen o'clock to his (Mr. Logan's) office for the purpose of delivering the checks to him and receiving from him Mr. Layton's letter and a receipt, and that he made arrangements to have a Deputy Sheriff, with the writ of attachment, in an adjoining office at the time of the exchange of the papers. Mr. Satterthwaite arrived about on time. The papers were exchanged at substantially the same time, and immediately after the checks had been handed to Mr. Satterthwaite the Deputy Sheriff entered the office to serve the writ of attachment. Before the service of the writ, Mr. Satterthwaite dropped the checks on the desk at which he was sitting, and remarked, "I didn't accept the checks." That before Mr. Satterthwaite left the office, and after the writ had been served on him, Mr. Logan said to Mr. Satterthwaite, in the presence of the Deputy Sheriff, "You had better take these checks." To which Mr. Satterthwaite replied, "No, I won't take them." That Mr. Satterthwaite often repeated the statement in the presence of the Deputy Sheriff, "Well, I didn't accept the checks." That after Mr. Satterthwaite left the office, Mr. Logan, in referring to the checks, told the Deputy Sheriff, "You might as well take them as long as Mr. Satterthwaite apparently didn't want them." Mr. Logan further testified in referring to the Sheriff's return to the writ of attachment: "I was naturally concerned as

to whether or not a proper return would be made in view of the particular circumstances of Mr. Satterthwaite leaving the checks in my office and the Sheriff taking them at my instruction." He testified he gave no instructions to the Sheriff as to how to prepare the return, but that he was satisfied with it.

If the garnishee be correct and the checks had not been accepted by Mr. Satterthwaite, but the checks being present they had been actually seized and possessed by the Sheriff, then, of course, such facts could constitute no basis for garnishment proceedings against Mr. Satterthwaite.

But assuming that Mr. Satterthwaite had accepted the checks from Mr. Logan, which checks were taken possession of by the Deputy Sheriff, the question still presents itself as to whether or not Mr. Satterthwaite at the time of the service on him of the writ, or at any time thereafter and prior to the entry of the plea of "Nulla Bona," had any money or credits in his hands belonging to Mr. Warrick.

Whether or not Mr. Satterthwaite had any money or credits in his hands belonging to Mr. Warrick, even if he had accepted the checks, depends upon whether such acceptance of the checks operated as an assignment of the funds represented thereby. If the checks had been ordinary checks and had not been certified, there can be no question that their acceptance would not operate as an assignment of funds. This question is directly answered by *Sec.* 3313, *Revised Code of* 1935, hereinafter considered.

But the plaintiff contends that when a check is certified there come into play rules relative to the assignment of funds which are entirely dissimilar from those rules governing ordinary checks. This may be conceded, but a discussion of the rules concerning certified checks must be preceded by a consideration of the party at whose instance

the check is certified, because this question is of great materiality.

Concerning the certification of the checks, Henry T. Bush, who was one of the receivers, testified ·as follows:

"X. Do I understand you to say that you didn't have these checks certified? A. I personally did not.

"X. Well, did you know anything about it? A. I didn't know anything about the certification. I was out of town at the time they were certified.

"X. Do you know who did get them certified? A. I really don't know.

"X. Don't you know that Mr. Logan got them certified? A. I don't know. He may have instructed that they be certified. I don't know who did it.

"X. Did you instruct anyone to cause these checks to be certified? A. I did not.

"X. As a matter of fact, you didn't know that they were certified? A. No, by reason of my being out of town at the time they were certified.

"X. Did the order of the Court require the checks to be certified? A. No.

"X. Then the certification of these checks, as I understand it, was done without the authority of the receivers? A. Yes. I presume the bank certified them on the authority of counsel for the receivers, which, I think, would be a normal procedure.

"X. But the receivers had not given any directions that the checks be certified? A. No."

It clearly appears from the evidence that neither Mr. Warrick nor anyone in his behalf, requested that the checks be certified. It is equally clear that the checks were not certified by direction or authority of the makers, or either of them. We are convinced from the evidence that Mr. Logan's interest in securing the certifications was as attorney for the plaintiff in this case, and not as solicitor for the receivers, and that therefore the certifications were procured by a stranger to the instruments.

We must now, therefore, consider the applicable principles of law governing the assignment of funds represented by the acceptance of a certified check, and especially

where the certification was not had at the instance of the payee, but by a stranger to the check.

The plaintiff concedes that *Section* 188 (*Section 3312, Revised Code of* 1935) of the *Negotiable Instruments Law* has to do with the effect of a certification procured by the payee. It is upon *Section* 189 (*Section* 3313, *Revised Code of* 1935) of the law that the plaintiff relies. It reads as follows:

"Cheque; Operation of on Funds of Maker:—A cheque of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder, unless and until it accepts or certifies the cheque."

It is quite obvious that one of the objects of the National Conference in approving this section was to effect a change, where necessary, in the law of those States adopting it by providing that the holder of an uncertified check was no longer to be deemed to be the assignee of the fund represented by it. The view of the Supreme Court of this State is in harmony with the change.

In *Polotsky v. Artisans Savings Bank*, 7 *W. W. Harr.* (37 *Del.*) 151, 188 *A.* 63, 65, 107 *A. L. R.* 1458, the Supreme Court of this State said:

"Where a check in the ordinary form is drawn, whether by an individual or a bank, and the same is not certified, there is no transfer nor assignment of funds from the maker's account to the credit of the payee. The check remains nothing but an order revocable at any time before acceptance."

Our concern is with the meaning of the qualifying phrase, "and the bank is not liable to the holder, unless and until it accepts or certifies the cheque," as contained in said section.

As we understand the law, the certification of a check by the drawee bank upon the application of either the drawer or holder, results in the assumption by the bank

of a contractual undertaking by which its relations with the drawer or holder, as the case may be, are materially affected.

We are unable to see upon what theory it would be proper for the drawee bank to bring about any change in such relationship, upon the application of a stranger.

The fact that the certifications in question were procured by a stranger to the instruments has no bearing whatever on any contractual relation between Mr. Warrick or his attorney on one side, and either the drawers or the drawee bank on the other.

This was the view taken by the Court in *Central Hanover Bank & Trust Co. v. The Mirror*, 155 *Misc.* 366, 279 *N. Y. S.* 671, 675, in which it was said:

" 'Where a check is certified at the instance of a person having no authority from any one of these (maker, holder or payee), the certification will not constitute an acceptance so as to change the relation of the parties and work an assignment of the bank's funds.' "

Citing *Gasper v. Security State Bank*, 109 *Neb.* 495, 498, 191 *N. W.* 654, 656, decided under the provisions of the *Uniform Negotiable Instruments Law*.

It is, however, the contention of the plaintiff that the certifications were upon the authority of the receivers.

In considering the effect of a certification of a check procured by the drawer before delivery, in 7 *Am. Jur. tit. Banks*, at 411, we find the following, which is supported by numerous authorities:

"It is a well-settled general principle that certification of a check, when procured by the drawer before delivery of the check, does not affect the relation, duties, and obligations between himself and the payee or holder. In other words, the drawer of a check who has it certified before delivery is still liable to the holder for the amount of the check until it is paid. * * * The only effect of a certification obtained by the drawer is to give additional currency by adding to his credit the credit of the drawee bank, which thereby becomes bound; beyond that nothing is added to the legal force or effect of the instrument."

The court's opinion in the case of *McIntire v. Raskin*,

173 *Ga.* 746, 161 *S. E.* 363, 365, chiefly relied on by the plaintiff, is not inconsistent with this principle. In that case the Court said:

"As we have seen, an ordinary check of itself does not operate as an assignment of any part of the funds to the credit of the drawer in the bank, and the bank is not liable to the holder unless and until it accepts or certifies the check. This necessarily means that the acceptance or certification of the check operates as an assignment of the funds to the credit of the drawers with the bank sufficient to pay the check accepted or certified. The fact that the check was certified at the instance of the drawers and before delivery does not alter the principle just announced."

The court makes this distinction between a certification at the instance of the payee and one at the instance of the drawer. It said:

"If this check had been certified at the instance of the payee, the bank would have become the absolute debtor of the holder, and the drawers would have been released. * * *

"As this check was certified at the request of the drawers, the effect was to assure the person afterwards receiving it that it was genuine and would be paid. In such case the bank and the drawer both would be bound, the bank being primarily and the drawers secondarily liable. The drawers would only be liable on the failure of the bank to pay the check."

This distinction has been recognized by numerous authorities, among which are *Railway Express Agency v. Thomas,* (*D. C.*) 5 *F. Supp.* 345; *Florida P. & L. Co. v. Tomasello,* 103 *Fla.* 1076, 139 *So.* 140; *Seager v. Dauphinee,* 284 *Mass.* 96, 187 *N. E.* 94; *City of Brunswick v. People's S. Bank,* 194 *Mo. App.* 360, 190 *S. W.* 60; *Sutter v. Security T. Co.,* 95 *N. J. Eq.* 44, 122 *A.* 381, 96 *N. J. Eq.* 644, 126 *A.* 435, 35 *A. L. R.* 938; *Commercial Inv. Trust v. Windsor,* 197 *N. C.* 208, 148 *S. E.* 42.

Our view of the McIntire case, on the point in issue, is that the court went no further than to hold in effect that the certified check operated as an assignment to the bank.

This view is in accord with what the court said in *Downey v. Citizens' State Bank,* 100 *Ind. App.* 158, 194

*N. E.* 743, 744, in which the court, in considering the effect of a certification on application of the drawer, after referring to said *Section* 189, used the following language:

"Assuming, as we must from the language of the statute, that the certification of the check payable to order operated as an assignment, we are of the opinion that the assignment was only from the drawer to the bank. The drawer by consenting to the certification in effect assigned the amount of the check to the bank, and the bank then became the debtor of whosoever should present the same in due course to the bank for payment."

■ If we accept the plaintiff's views on the point now being considered, we would be compelled to hold that the funds represented by the checks had been assigned by the receivers to Mr. Satterthwaite, as attorney or agent for Mr. Warrick, and were held by the drawee bank to his credit, and that thereby the order of the chancellor to pay Mr. Warrick forthwith the allowances made to him by the chancellor had been complied with. This we are unwilling to do. It is immaterial whether we consider that the certifications did not constitute an acceptance so as to change the relation of the parties, or whether we consider the funds represented by the checks as becoming upon their certification frozen, or held in escrow by the drawee bank, or as assigned to the said bank. In any event the drawee bank, at most, would be nothing more than a debtor to the holder of the check, and if we are to consider Mr. Satterthwaite as the holder, he would not, as such holder, be indebted to Mr. Warrick. No relationship of debtor and creditor could arise between Mr. Satterthwaite and Mr. Warrick until the bank had discharged its obligation to Mr. Satterthwaite by paying the checks, or by placing the funds represented by them to Mr. Satterthwaite's credit, neither of which could be done by the bank except upon presentation of the checks by Mr. Satterthwaite.

■ We think the correct rule is that stated in *Commercial Inv. Trust v. Windsor,* 197 *N. C.* 208, 148 *S. E.* 42, 44, which was decided in 1929, at which time the *Uniform*

*Negotiable Instruments Law* had been in force in North Carolina for approximately twenty years. There the court said:

"If the drawer delivers the check already certified the relations, duties, and obligations between him and the payee or holder are the same as if the check had not been certified. It is otherwise where the check is delivered without certification, and the holder, instead of presenting it for and receiving payment, presents and procures it to be certified."

We are of the opinion that the certification of the checks, procured as they were by Mr. Logan, as attorney for the plaintiff, did not operate as an assignment of the funds represented by them to Mr. Satterthwaite, as attorney or agent for Mr. Warrick.

(3) The effect of the receipt signed by Mr. Satterthwaite.

The testimony is conflicting as to whether or not Mr. Satterthwaite ever delivered the receipt to Mr. Logan. Mr. Logan states that he did; Mr. Satterthwaite states that Mr. Logan picked it up from the desk.

The plaintiff argues that as Mr. Satterthwaite gave Mr. Logan a written receipt for the payments evidenced by the checks at the time Mr. Logan gave him the checks, he cannot be heard to say that he did not accept the checks, as to do so would be to contradict his written receipt, contrary to the parol evidence rule.

In *Williston on Contracts, Revised Edition, Section* 632, we find the following:

"The parol evidence rule does not forbid the contradiction of an instrument or a portion of an instrument which purports merely to recite facts—like a receipt."

This rule has consistently been followed in this State. Our courts have on numerous occasions held that while a receipt is prima facie evidence of payment, it is always subject to explanation. See *State to Use of Fowler*

*v. Robinson, 2 Harr.* 5; *Derrickson v. Morris, 2 Harr.* 392; *Fitzgibbon's Adm'r v. Kinney, 3 Harr.* 317; *Faris' Adm'r v. Frazier, 4 Harr.* 206; *Star Loan Asso. v. Moore, 4 Penn.* 308, 55 *A.* 946.

Having concluded that no goods, chattels, rights, credits, money or effects of Mr. Warrick were attached in the hands of Mr. Satterthwaite by virtue of the garnishment proceedings, it is unnecessary to consider whether such garnishment proceeding was attended with evidence of such fraud or trickery as to require that such proceedings be quashed.

Judgment must be entered in favor of the garnishee.